[Civ. No. 2179. Fourth Appellate District.—November 10, 1938.]

MINNIE AMANDA EVANS, as Executrix, Plaintiff and Respondent, v. THE CITIZENS NATIONAL TRUST AND SAVINGS BANK OF RIVERSIDE (a National Banking Association) et al., Defendants and Respondents; JAMES M. LEAVER, Jr., Defendant and Appellant.

Hill, Morgan & Bledsoe, Benjamin F. Bledsoe and Charles P. McCarthy for Appellant.

Guy Richards Crump and Sarau & Thompson for Respondents.

BARNARD, P. J.—This is an action for declaratory relief involving the meaning of portions of a contract entered into by and between James M. Leaver, Jr., Charles E. Evans and George D. Parker. Each of these parties invented and was the owner of certain patents and patent rights in connection with wire-tying machines to be used in the wire binding of boxes, bundles and various packages. In pursuance of a plan to use the best ideas of these various inventions in an improved and "standard" machine for this purpose, and to work together in developing, improving and marketing such a machine these parties executed a contract dated October 19, 1922.

This agreement, after describing the patent rights owned by each of the parties states that because the parties have considered it advisable to consolidate the inventions owned by them, ''having found by experience that it will be more economical for them to maintain a common selling agency'', because each invention will be benefited by using, so far as desired, the other inventions, because it will be to their joint interests to place all of the inventions in the hands of one of the parties ''under an exclusive license for the manufacture and the sale thereof'', and because the said Parker is equipped to carry on the manufacture of the said machinery, is willing to assume such manufacture on orders taken by himself and the other two parties and is willing to advance the money necessary for certain designated purposes, the parties contract to do certain things then set forth in numbered paragraphs. Several of these paragraphs will not be mentioned as they are not material here.

In paragraph 1 Leaver grants to Parker ''an exclusive license for the manufacture and sale, and to have manufactured on his behalf for sale, the inventions covered by certain patents owned by Leaver''. In paragraph 2 Evans consents to and ratifies said exclusive license in so far as he is interested in any of said patents. In paragraph 3 Evans, using language similar to that used in paragraph 1, grants to Parker an exclusive license for the manufacture and sale of inventions covered in certain patents owned by him. In paragraph 4 Leaver and Evans grant to Parker ''an exclusive license for the manufacture and sale'' and ''to have manufactured on his behalf for sale'' any future invention which either of them may make or acquire relative to wire-binding machinery, ''the spirit and meaning and intent hereof being that the said George D. Parker shall have the exclusive right for the manufacture and sale'' in connection with any such future inventions. In paragraph 5 Parker agrees that he will manufacture such machines ''as may be decided upon and agreed to between the parties hereto as the standard form of apparatus to be manufactured and sold in the interest of all parties hereto'', and that the said machine shall be manufactured at actual cost with a manufacturer's profit to Parker of 25 per cent of the cost of manufacture on all machines which may ''be manufactured by him for sale or which may

be manufactured by him on orders received from the other parties hereto for the sale of such machines''. In paragraph 6 it is provided that either party selling the machines shall receive as a commission 10 per cent of the selling price.

Paragraphs 8 and 9 provide for a division between the parties of the proceeds of the sale of machines after deducting the manufacturer's profit, the selling commission and another item not material here. In paragraph 11 Parker agrees ''that under his exclusive herein granted rights for the manufacture and sale'' of such machines he will account for the proceeds in accordance with the terms of this contract. In paragraph 14 it is agreed that ''this license and contract agreement shall continue so long as the said George D. Parker complies with the terms and conditions hereof and manufactures the machines to supply orders therefor'', and that in the event Parker is unable to manufacture the machines for reasons beyond his control the others shall have the right to have the machines manufactured elsewhere until Parker is again able to manufacture them.

Paragraph 15 provides: ''The intent of the parties hereto is that the said George D. Parker is to have an exclusive license for the manufacture, for the sale within and throughout the United States and the territories thereof and for the manufacture in this country for sale in foreign countries, or to have manufactured on his behalf for sale, any and all types of wire-binding machinery which shall be decided upon to be placed on the market as the product of the manufacturing establishment of the said George D. Parker''. It is then provided that each party ''will endeavor to the best of his ability to exploit the said inventions and promote the sale thereof'', that each will assist the others in developing a standard machine, that Parker is to ''hold himself in readiness to supply all orders placed with him by the other parties hereto for the manufacture and sale of such machinery'', and that the exclusive license thus given to Parker shall continue throughout the life of every patent now or hereafter owned by the other parties so long as Parker keeps himself equipped to manufacture and does manufacture such machines. Paragraph 20 provides ''It is understood and agreed that the commission hereinbefore provided for to be paid unto the party selling standardized machines manufactured by the

said George D. Parker shall be paid unto the party making the sale after the money for said sold machine shall have been received by the said George D. Parker''. Paragraph 25 reads as follows:

''It is further understood and agreed to by and between the parties that in case of the death of either party hereto the rights hereunder of such party shall continue for the benefit of the heir executor or administrator of such party to the full extent as herein provided for, except that in the event of the death of the said George D. Parker the other parties hereto or the survivor thereof shall have the right to carry on the manufacture of the machines previously manufactured by the said George D. Parker and as such manufacturer shall be entitled to receive the 25% over and above the cost of manufacture as provided for in paragraph 5 hereof to be paid unto the said George D. Parker.''

Pursuant to this contract a machine was developed and placed on the market and a profitable business was carried on. Parker died on August 24, 1930. On July 7, 1931, Leaver and Evans entered into a second agreement and on July 14, 1931, these two parties, with Parker's executrix, entered into a third agreement, which agreements will be later mentioned. Evans died on December 31, 1934. A dispute arose between Leaver and the heirs and representatives of Parker and Evans as to the respective rights of the parties under the original contract, and this action followed.

The main controversy is as to who has the manufacturing rights and who has the sales rights with respect to this machine under the terms of the original contract. The court found and decreed that the right to manufacture said machines is vested in the estate of Evans and in Leaver as tenants in common, and that the heirs of Parker, subject to the administration of his estate, own and have the exclusive right to sell these machines except that Leaver and the heirs and executrix of Evans each have the right to take orders for such machines and to have such orders filled by the Parkers and to receive the selling commissions provided for in the original contract on orders so taken. Leaver has appealed from these and other portions of the decree, it being his contention that he is entitled to the exclusive manufacturing rights as the survivor of the three original parties, and that he is also

entitled to the exclusive selling rights both because the selling rights necessarily accompany the right to manufacture and because each of the original parties was equally entitled to sell the machines, which right has come to him as the survivor.

It must be conceded that certain portions of the contract are not too clear and that certain seeming inconsistencies appear therein. It was the duty of the court to so interpret the contract as to give effect to all parts thereof, in so far as possible. While the appellant contends that his interpretation is the only reasonable one that may be placed upon the agreement, it may first be noted that it would be somewhat singular for these parties, in thus pooling their interests to the end that a successful business should be established, to have agreed that in the event of its success the fruits thereof should be lost to the families of those dying first, and that the product of the combined work of all should largely, if not entirely, go to the benefit of the survivor to the exclusion of the heirs of the others. While such an arrangement would be possible it does not commend itself as the most reasonable explanation of what must have been in the minds of the parties.

The right to manufacture and the right to sell are distinct rights which may be separately granted or conferred by the patentee. (*Adams* v. *Burke,* 84 U. S. (17 Wall.) 453 [21 L. Ed. 700].) The exclusive right to manufacture, with an exception not material here, was given to Parker by the original contract, and remained in him until his death. Paragraph 25 of the contract provided that upon his death "the other parties hereto or the survivor thereof" should have that right. When Parker died the other two parties were living and under the plain meaning of the language used the right to manufacture then passed to them. The appellant seems to concede this, he and Evans having acted for some years on that assumption, but he would now add to the language used a further provision that upon the death of one of those two the right to manufacture should again pass to the survivor. It is argued that this is the most reasonable interpretation because the word "survivor" relates to "the other parties" and not to the death of Parker, and because it is most reasonable to suppose that the parties intended to have the right to manufacture continued not only in one per-

son but in one of the original parties, free from any interference from the heirs of other parties. As to the latter part of this contention the reason for originally giving the right to manufacture to Parker was because he was the one best equipped to carry on the same. Moreover, Parker being the licensee, it was reasonable to provide that at his death the licensors should become reinvested with a part of the rights which they had granted. Be that as it may, the agreement plainly provides for something that is to take place in the event of the death of Parker, namely, that the other two parties to the agreement shall then have the right to manufacture the machines. While it was also provided that if one of the other parties should not then be living the right of manufacture should pass to the survivor this contingency did not occur, and, clearly, the right passed to Leaver and Evans. Having so passed, there is no provision in the contract that upon the death of one of them this right should again pass to the survivor. Upon the subsequent death of Evans this right passed to his heirs or personal representative under the plain provisions of the first part of paragraph 25 of the contract.

With respect to the sales rights in connection with these machines it may reasonably be said that the contract treats the same as distinguished from the manufacturing rights and it follows that they do not necessarily accompany the manufacturing rights. Clearly, certain sales rights were given to Parker by the contract and paragraph 25 thereof plainly provides that in case of the death of any party the rights of that party shall continue for the benefit of his heirs, executors or administrators with the single exception of the manufacturing rights in the event of the death of Parker. This applies to any sales rights that Parker had and the question here presented is whether, under the contract, Parker had an exclusive right to handle the sales of these machines or whether no such provision was made and each of the parties was free to make sales without regard to the others and retain a commission for so doing. The preamble to the contract gives as one of the main reasons for entering into the same the fact that the parties desired "to maintain a common selling agency". In numerous places Parker is given an exclusive license both for the manufacture and sale

of the machines to be produced, and it is reiterated that the spirit and meaning and intent of the instrument is that he shall have "the exclusive right for the manufacture and sale". While it is also provided that any party who sold machines should receive a commission of 10 per cent of the selling price it was specifically provided that such a commission should be paid only after the money had been received by Parker. It seems apparent that the right of one of the parties individually to sell machines and be paid something therefor is quite different from the right of a party to maintain a common selling agency controlling and receiving the money for all sales with the natural right to appoint agents aside from the other parties to the agreement, and in general to promote and carry on the general business of selling machines. This natural difference is recognized and emphasized here by the provisions requiring Leaver and Evans, in exercising their right to make sales, to work through Parker and turning the proceeds over to him before being entitled to receive payment from him. Reasonably interpreted, the contract in effect creates a common selling agency in the person of Parker, with the right in the other parties to sell such machines as they were individually able to do, closing the sales through Parker and, in practical effect, as his agents although he had the right to appoint other agents as well. Such an interpretation gives an effect to provisions of the contract which would otherwise not be possible. This was the view taken by the trial court and, being reasonable, is entitled to stand even though a different interpretation of the contract might be plausible. (*Kautz* v. *Zurich Gen. A. & L. Ins. Co.*, 212 Cal. 576 [300 Pac. 34]; *Adams* v. *Petroleum Midway Co., Ltd.*, 205 Cal. 221 [270 Pac. 668].)

A contention on the part of the appellant that two contracts executed in 1931, after the death of Parker, disclose that the parties themselves interpreted the original contract entered into in 1922 as not giving any exclusive sales right to Parker is without merit. In a contract dated July 14, 1931, Leaver and Evans, after reciting that they had succeeded to the right to manufacture these machines because of the death of Parker, agreed that for a term of five years they would have the manufacturing done for them by a corporation which Mrs. Parker would cause to be organized,

which corporation should take over the manufacturing plant which had formerly been run by Parker and in which the machines had been manufactured. It was also provided that for the same period Leaver would have the right to sell machines in a certain territory, Evans in another territory and the Parker interests in a third territory. On July 14, 1931, Leaver, Evans and the executrix of the Parker estate entered into another agreement which, in practical effect, confirmed the other agreement. However, these agreements were to operate for a limited term, which has expired, and each thereof contained the clause that none of the parties thereto waived any of his rights or claims under the original agreement of 1922 except as therein expressly set forth. While these 1931 contracts modified the original agreement somewhat during the time they were in force they have no other effect and in no way disclose the intent and meaning of the original contract of 1922 or constitute a practical interpretation thereof by the parties interested.

The appellant makes certain minor objections to the form of the decree in several respects. ▮ It is first urged that the court erred in including in the decree a provision permitting the heirs of Parker or the administrators of his estate to manufacture machines in the event that Leaver and Evans should fail or refuse to manufacture and supply them in sufficient quantities to supply the trade, after reasonable opportunity given and adequate arrangements for paying them. The only argument made is that no specific provision for such an eventuality is contained in the contract and that the court exceeded its powers in making such a provision. While the contract contains no such definite provision something of the kind might become necessary in order to protect the rights awarded to the Parker interests by the decree and in thus providing, in effect, that its decree might not be rendered worthless by the refusal of any party to act, the court was not only carrying out a provision which could well be implied from the contract but was exercising its jurisdiction to completely dispose of an equitable matter submitted to it. It is next contended that in requiring Leaver and the Evans interests to manufacture and supply the Parker interests with machines in sufficient quantities to enable them to exercise the rights of sale given them by

the decree the court erred in providing that such machines should be furnished "at a reasonable cost price, plus said manufacturer's profit". It is argued that the contract refers only to the cost price of the machines and not to the "reasonable" cost price thereof. In any controversy that might arise under the original contract the cost price referred to would have to be the reasonable cost and not one that is arbitrarily or unnecessarily raised. While the word "reasonable" could well have been omitted from the decree, it cannot prejudice the appellant. It is next argued that the court erred in providing in the decree that "neither Leaver nor Evans engaged in the manufacture of wire-tie machinery may sell, except to the heirs of Parker or Parker's administrators, unless Parker's heirs or administrators fail or refuse to supply the demands of the trade for such machines and parts". It is argued that both Leaver and the heirs of Evans have the right to sell the machine to anybody and collect a commission. This is recognized by the decree and the clause objected to must be read in connection with the other clause giving the heirs of Parker the right to sell the machines "except that Leaver and the heirs and executrix of Evans each have the right to take orders for such machines and parts and have said orders filled by the heirs of Parker and the administrators of his estate, and to receive the selling commissions referred to in the contract of October 19, 1922, on orders so taken." The decree merely provides that, as manufacturers, Leaver and the Evans heirs can only sell to the Parker heirs, who hold the exclusive right of sale, but as agents of the Parker heirs Leaver and the Evans heirs may take orders and have them filled by the Parker heirs. This is in accordance with the interpretation placed upon the contract by the court, which we have held to be a reasonable one. It is further objected that the court erred in holding that upon the death of Leaver the manufacturing rights and all other rights under this contract which are vested in him will pass to his heirs, executors and administrators. It is argued that this is an interference with the right of Leaver to dispose of such rights by will. It is perfectly obvious that in making this provision the court was merely completing its task of interpreting the contract under which these rights were acquired,

and was in no way attempting to interfere with Leaver's testamentary rights or privileges.

■ It was alleged in the complaint that Evans had invented and applied for a patent for a device for tying packages, bundles, bales and boxes by rope, and it was alleged that the respondent Evans had the right to manufacture and sell such devices and the court was asked to pass upon the question of whether such manufacture and sale was forbidden by the 1922 contract. These allegations were all denied in the answer of the appellant and the court found in that regard that "defendants and none of them, have any right, title or interest in or to said rope-tie device" and that neither the plaintiff nor the heirs of Evans have the right, in manufacturing, selling or using the same, to use in connection therewith any device covered by any patent or patent rights owned by Leaver or by the heirs or administrators of Parker. While the appellant concedes that the contract in question does not cover this rope-tying device it is argued that the court exceeded its jurisdiction in making these findings and that these findings, in effect, constitute a decision that this rope-tying device is not an infringement of the standardized wire-tying machine which was developed and marketed pursuant to the contract of 1922, a matter which was solely within the jurisdiction of the federal courts. The court was interpreting the contract of the parties and merely held, in so far as that contract was concerned, that the other parties had no ownership or interest in this device, the only question which was raised by the pleadings. No attempt was made to pass upon the question whether that device would constitute an infringement upon the other patent rights and the court's decision here would have no effect upon such a question in the event it should be raised in a proper tribunal.

The judgment is affirmed.

Marks, J., concurred.